IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LLOYD WHITE, §
§
*Plaintiff,* §           SA-19-CV-00530-ESC
§
vs. §
§
STERLING FOODS, §
§
*Defendant.* §

## ORDER ON MOTION FOR SUMMARY JUDGMENT
## AND MISCELLANEOUS MOTIONS

Before the Court in the above-styled cause of action is Defendant's Motion for Summary Judgment [#104]. Plaintiff has also filed numerous *pro se* motions with the Court regarding his claims and the disposition of Defendant's summary judgment motion [Motions #116, #118, #125, #127, and #129]. In response to motion #127, Defendant has filed a Motion to Strike [#128].

For the reasons set forth below, the Court will deny motions #116 and #125, terminate motion #118 (construing it as a supplemental response to the motion for summary judgment), grant Defendant's motion to strike #128, and strike motions #127 and #129. After considering Plaintiff's brief in response to Defendant's motion for summary judgment [#119], Document #118 (Plaintiff's supplemental response), and the summary judgment evidence before the Court, the Court will grant Defendant's motion for summary judgment as to all of Plaintiff's claims.

## I. Jurisdiction

The Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* ("Title VII") and the Americans with Disabilities Act of 1990, as amended, 42

1

U.S.C. §§ 12101, *et seq.* ("ADA"). (Second Am. Compl. [#81], at ¶ 1.) The undersigned has authority to enter this Order because both parties have consented to the jurisdiction of a United States Magistrate Judge [#21, #22, #29].

## II. Procedural Background

Plaintiff Lloyd White, proceeding *pro se*, filed this cause of action on May 14, 2019, against his former employer, Sterling Foods, and several of its employees, alleging racial discrimination, harassment, and retaliatory termination. (Compl. [#1-1].) Plaintiff failed to serve the individual Defendants, and the District Court dismissed them from this case for failure to timely effectuate service under Rule 4(m) of the Federal Rules of Civil Procedure, leaving Sterling Foods as the only Defendant. (Order [#29].)

After the District Court reassigned this case to the undersigned, numerous issues arose surrounding the exchange of discovery, and the Court appointed Plaintiff counsel pursuant to 28 U.S.C. § 1915(e)(1). Counsel filed a Second Amended Complaint on Plaintiff's behalf, which remains the live pleading in this suit. (Second Am. Compl. [#81].) The parties conferred and agreed to extend the deadline by which to complete discovery to November 6, 2020, which the Court approved. (Order [#96].)

The Second Amended Complaint alleges that Plaintiff, who is African-American/Black, was subjected to racial slurs throughout his employment with Defendant from his supervisor Javier Patlan. (Second Am. Compl. [#81], at ¶ 6.) Plaintiff claims that after he reported the discrimination to management and human resources, he was injured on the job and was ultimately terminated. (*Id.* at ¶¶ 7–12.) Plaintiff believes his termination was a result of unlawful racial discrimination and asserts claims of race and disability discrimination, hostile work environment, and retaliation in violation of Title VII and the ADA. (*Id.* at ¶¶ 18–22.)

Issues between Plaintiff and his appointed counsel arose, and Plaintiff filed a *pro se* motion to request new counsel. While the motion was pending, Defendant filed the motion for summary judgment currently before the Court. After holding an *ex parte* hearing on the motion for new counsel, the Court provided Plaintiff with the choice to either proceed with his appointed counsel or represent himself *pro se*. Plaintiff elected to represent himself in this action, and his former attorney provided Plaintiff with copies of all existing discovery that had been exchanged between the parties. The Court also provided Plaintiff with over three additional weeks to file a *pro se* response to Defendant's motion for summary judgment. (Order [#109].)

Several weeks later, Plaintiff requested even more time to file his response and complained of lack of access to discovery. The Court granted the motion and gave Plaintiff two more weeks to file his response, making the response due on January 22, 2020. (Order [#114].) In this Order, the Court also instructed Plaintiff's former counsel to file an advisory with the Court confirming the date she transmitted the case file to Plaintiff to assist his preparation of a summary judgment response. Plaintiff's former counsel filed the advisory on December 21, 2020, attaching the United States Postal Service receipt confirming that Plaintiff received the case file and counsel's letter instructing him to file a summary judgment response on December 17, 2020. (USPS Tracking [#115].)

Plaintiff filed several motions and filings around the deadline for his summary judgment response, which included a motion for another extension of time to file a response due to a fracture of his right hand, which is his writing hand. The Court granted the motion, canceled the trial setting in this case, and abated this case pending Plaintiff's recovery. (Order [#121, #122].) After the Court received an advisory that Plaintiff had returned to work and had regained the ability to draft documents for the Court's consideration, the Court lifted the stay and gave

Plaintiff a final deadline to respond to the summary judgment motion of March 31, 2021. (Order [#124].)

Plaintiff thereafter filed three additional motions, including yet another motion for additional time to respond to the summary judgment motion. In response, Defendant filed a motion to strike. Before evaluating Defendant's motion for summary judgment, the Court will address these miscellaneous motions.

### III.  Miscellaneous Motions

Plaintiff has filed five *pro se* motions since the withdrawal of his Court-appointed attorney, and Defendant has filed a motion to strike. The Court considers each motion in turn.

**Motion #116.** Motion #116 is titled "Motion for Continuous Rule § 252: Due Process the Fifth and Fourteenth Amendment of the United States Constitution of the United States of America." In this motion, Plaintiff argues that the Court failed to appoint qualified counsel to assist him in the prosecution of his case and that he has been deprived of meaningful discovery from Defendant. Defendant filed a response in opposition [#117], which the Court has reviewed in attempting to ascertain the relief Plaintiff is requesting in his motion.

Plaintiff appears to be both asking for new counsel and requesting more time for discovery. The Court will deny the motion. The Court appointed Plaintiff a well-respected and qualified attorney to assist him in the prosecution of his case. Plaintiff elected to terminate the appointment and represent himself *pro se*. The Court reminds Plaintiff that the appointment of counsel in a civil case is a privilege, not a right. *See Akasike v. Fitzpatrick*, 26 F.3d 510, 512 (5th Cir. 1994); *Cupit v. Jones*, 835 F.2d 82, 86 (5th Cir. 1987). Plaintiff is not entitled to the appointment of a new attorney.

Regarding the request for additional time to conduct discovery, Plaintiff has had ample time in which to conduct discovery in this case, both with and without the assistance of counsel. The Court appointed Plaintiff counsel specifically to assist with the discovery process, and counsel filed a motion for reconsideration of Plaintiff's previous *pro se* discovery motions, which sought video recordings from the day of Plaintiff's injury (June 6, 2018) and October 18 and 19, 2018 (the days immediately preceding Plaintiff's termination). At the Court's hearing on the motion filed by Plaintiff's counsel, Defendant represented to the Court that some of the requested video footage no longer existed, because it had been written over before it was requested in accordance with Defendant's retention and overwriting practices. The Court issued an Order denying the motion for reconsideration but ordered Defendant to provide Plaintiff a sworn declaration of its retention policies, which videos are available and have been retained, and which videos have been destroyed and overwritten, so that Plaintiff could do additional discovery on whether Defendant followed its policies in overwriting the videos. (Order [#92].)

Plaintiff filed motion #116 more than ten weeks after the close of the discovery deadline, and the Court finds no reason to reopen discovery at this time. *See* W.D. Tex. Loc. R. CV-16(e) (all discovery motions must be brought within the discovery deadline "unless they are filed within 14 days after the discovery deadline and pertain to conduct occurring during the final 7 days of discovery"). Plaintiff's *pro se* status does not constitute good cause for failing to abide by the discovery or scheduling order deadlines. *See Jones v. FJC Security Servs., Inc.*, 612 Fed. App'x 201, 204 (5th Cir. 2015) (affirming district court's refusal to extend discovery after *pro se* plaintiff missed scheduling order deadlines).

Finally, the Court declines to entertain the accusations in Plaintiff's motion targeted at Defendant, such as collusion with Plaintiff's appointed counsel, obstruction of justice, and

perjury. Plaintiff's responsibility at this stage of the proceedings is to marshal evidence to support his legal claims and the factual allegations contained in his Second Amended Complaint against Defendant. The Court will not consider these *ad hominem* attacks in evaluating the merits of Defendant's summary judgment motion.

**Motion #118.** Motion #118 is titled "Summary Judgement [sic] Rule(3)" and addresses various pieces of evidence, or lack thereof, regarding Plaintiff's claims. The Court will terminate this motion and construes this filing as part of Plaintiff's response to Defendant's motion for summary judgment.

**Motion #125.** Motion #125 is titled "Extension because of Death in the Family." This motion was filed in the weeks after the Court lifted the stay on Plaintiff's case and imposed a final deadline for Plaintiff's response to the summary judgment motion. The motion asks for additional time to respond due to a death in the family. Defendant filed a response in opposition to the requested extension [#126].

The Court will deny this motion. Plaintiff has had the benefit of numerous extensions of time due to his medical injury and *pro se* status. The Court declines to afford Plaintiff any more opportunities to satisfy his procedural and evidentiary obligations before this Court. *See Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law."). Moreover, months have passed since Plaintiff reported a death in the family and Plaintiff's subsequent filings suggest he is capable of litigating the case and that the relief he requested in this motion (an extension due to the death in the family) is now moot.

**Motion #127.** Motion #127 is entitled "Judicial Notice, Sterling Food's Illegal Tactics and Suppression of Evidence." This motion, like motion #118, addresses the substance of

Plaintiff's claims and accuses Defendant of suppressing evidence. Defendant has filed a motion asking the Court to strike this motion as untimely [#128]. The Court will grant Defendant's motion to strike. This motion was filed more than six months after the close of discovery and more than one month after the Court's final deadline for filing a summary judgment response. The Court will not consider the filing in ruling on Defendant's summary judgment motion.

**Motion #128.** Motion #128 is a motion for reconsideration that also argues the merits of Plaintiff's case. As with motion #127, this motion is untimely, and the Court will not consider the motion in ruling on Defendant's summary judgment motion.

### IV. Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Catrett*, 477 U.S. at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating

that there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174. However, if the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## V. Summary Judgment Record

The summary judgment record establishes the following disputed and undisputed facts for purposes of Defendant's motion. Defendant hired Plaintiff on May 1, 2018, as a Depositor in the Production Department of its San Antonio, Texas, facility. (Dresner Decl. [#104-2], at 13, ¶ 6; Employment Offer [#104-2], at 19.) A depositor is responsible for ensuring that raw food product is passed through a hopper and deposited into appropriately sized equipment, which then passes along a conveyor belt to be placed into large racks. (Job Description [#104-2], at 21–22.)

Upon hiring, Plaintiff acknowledged his receipt and understanding of Defendant's Employee Handbook, Anti-Harassment Policy, and Code of Business Conduct and Ethics and agreed to perform his job in a professional manner and to abide by all policies and procedures included in the Employee Handbook. (*Id.* at 22; Sexual Harassment Policy and Acknowledgment Forms [#104-2], at 24–28.) Upon Plaintiff's hiring, his immediate supervisor

was Front-End Production Lead Javier Patlan, who reported to Mr. Perez. (Dresner Decl. [#104-2], at 15, ¶ 12.) Plaintiff worked his first day on May 2, 2018. (Timecard [#104-2], at 35.) Thereafter, Plaintiff was absent for 15 consecutive days. (*Id.* at 35–36.) Plaintiff returned to work on May 21, 2018. (*Id.* at 36.)

On June 6 or 7, 2018, Plaintiff completed an injury report, claiming that Mr. Patlan had turned on Plaintiff's machine, forcing Plaintiff to turn fast, which injured his back. (Injury Report [#104-2], at 50.) Plaintiff testified that Mr. Patlan did so in retaliation because Plaintiff had reported Mr. Patlan for calling him a monkey and slave. (Plaintiff Dep. [#104-2], at 95:10–20.) Plaintiff testified in his deposition that Mr. Patlan had stated, "We don't train monkeys here. You have to go to the zoo for that," and in the days immediately preceding the alleged injury had called him a slave. (*Id.* at 98:17–19.) Plaintiff further testified that he had reported Mr. Patlan's comments to Mr. Perez and to Human Resources prior to the injury, and that nobody in management ever made discriminatory comments towards him after June 6, 2018. (*Id.* at 100:5–14; 104:16–20; 109:24–110:5.) Defendant admits in its Answer that Plaintiff reported allegedly discriminatory remarks to its Human Resources Department. (Answer [#88], at ¶ 7.)

Plaintiff's response to Defendant's motion for summary judgment states that he made complaints to Mr. Perez and other supervisors Alex Martinez and Dennis Kasso, as well as Human Resources, regarding Mr. Patlan's behavior.[1] (Response [#119], at 4.) Plaintiff submitted with his response a statement that he represents was written by his coworker Ronnie

---

[1] Pleadings are not competent summary judgment unless they are verified as true and correct under penalty of perjury and thereby comport with the requirements of Rule 56 of the Federal Rules of Civil Procedure. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). Plaintiff's filings are sworn, and therefore the Court considers them as summary judgment evidence. (Responses [#118, #119].)

Ruiz, which states that Mr. Ruiz witnessed Mr. Patlan using these racial epithets and turning on the depository machine when Plaintiff's back was turned. (Ruiz Statement 1 [#118], at 8.) The statement is in Plaintiff's handwriting but bears a signature by another individual. (*Id.*) There is an additional statement, dated one month later, that matches the handwriting from the signature, in which Mr. Ruiz states that he did not witness the epithets and, if he had, he would have reported the incident to Human Resources immediately. (Ruiz Statement 2 [#118], at 9.) Plaintiff has expressed his belief that Defendant "tampered with" his witness, Mr. Ruiz, and forced him to recant his previous statement. (Response [#119], at 17.) Plaintiff repeatedly requested a copy of the video footage from the date of his injury from Defendant throughout discovery, but the video is no longer in Defendant's possession, allegedly due to Defendant's retention policy to overwrite tapes after a certain period of time. (*See* Order [#92].)

After Plaintiff's injury, Defendant reassigned Plaintiff to a new role on the muffin line, which Plaintiff held until his termination. (Plaintiff Dep. [#104-2], at 116:23–117:25.) In this position, Plaintiff was able to sit on a stool, rather than stand, and was responsible for placing paper liners into muffin pans before they went to the depositor. (*Id.*) Plaintiff was also afforded breaks, during which he was asked to sit on a stool at the entrance to the production facility and perform Good Manufacturing Practices ("GMP") checks, which included ensuring that employees had washed their hands and were wearing hairnets before entering the production area. (*Id.*) Plaintiff reported to Irma Garza in this new role, who oversaw the muffin line. (*Id.* at 138:19–23; Dresner Decl. [#104-2], at 15, ¶ 12.)

Plaintiff continued to have irregular work attendance after his injury, mostly due to pain from the injury. (Pl. Dep. [#104-2], at 163:12–23.) Plaintiff worked only eight days for the remainder of June 2018, 14 days in July 2018, and six days in August 2018. (Timecard [#104-2]

at 37–43.)  During this time, Plaintiff made comments to Human Resources Director Tere Dresner regarding his dissatisfaction with various people with whom he worked and his work assignments.  (Dresner Decl. [#104-2], at 15, ¶ 13.)  Ms. Dresner interviewed Ms. Garza and other individuals as a result of Plaintiff's comments.  (*Id.*)

On July 30, 2018, Ms. Dresner received a written statement from Ms. Garza regarding an incident involving Plaintiff.  (Dresner Decl. [#104-2] at 15, ¶ 14; Garza Statement 1 [#104-2], at 62.)  The statement described how Plaintiff had left his assigned area and instructed a new employee to leave her designated area so that she could obtain a fan for him.  (Garza Statement [#104-2], at 62–63.)  According to the statement, after Ms. Garza instructed both Plaintiff and the employee to return to their designated areas and communicate any requests to their respective supervisors, Plaintiff sarcastically requested permission from Ms. Garza to throw trash away, even though the trash receptacle was near his muffin line.  (*Id.*)  Ms. Garza reported in the statement that anytime she spoke with Plaintiff he became confrontational.  (*Id.* at 63.)  Plaintiff testified that it was Ms. Garza who was confrontational and that she would frequently "cuss [him] out" for stepping away from the line.  (Pl. Dep. [#104-2], at 138:19–23.)

The following day, on July 31, 2018, Ms. Dresner received another written statement from Ms. Garza regarding Plaintiff.  (Dresner Decl. [#104-2] at 15,  ¶ 15; Garza Statement 2 [#104-2], at 65.)  In the statement, Ms. Garza explained that Plaintiff was not meeting performance expectations, was instructing other employees to perform tasks and getting upset when they failed to complete them, was aggressive in his communications, and would regularly walk away from his designated work area.  (Garza Statement 2 [#104-2], at 65.)  The statement also provided that Plaintiff instructed his fellow employees to modify operations, misrepresenting a conversation he allegedly had with an agent from the U.S. Department of

Agriculture ("USDA"). (*Id.*) According to Garza, when she instructed the unit to return to the former process, Plaintiff became upset. (*Id.*) Plaintiff testified in his deposition that he believed he correctly relayed the USDA agent's directives to his fellow employees. (Pl. Dep. [#104-2], at 148:22–25.)

Ms. Dresner received three other written statements from Plaintiff's co-workers on the muffin line on July 31, 2018, describing interactions with Plaintiff and his difficulty following directives and complaining about his confrontational behavior. (Dresner Decl. [#104-2], at 15, ¶ 16; Chavez Statement [#104-2], at 68–71; Duque Statement [#104-2], at 72–73; Rodriguez Statement [#104-2], at 74.) The following day, Ms. Dresner received another written statement describing a situation wherein Mr. Patlan and Ms. Garza were discussing the day's plan, when Plaintiff interrupted them and told Mr. Patlan, "It's your fault my back is hurt now my back is f***ed up for life" and then abruptly walked away. (Dresner Decl. [#104-2], at 15, ¶ 17; Employee Statement [#104-2], at 76.) Several weeks later, on August 21, 2018, Mr. Perez observed Plaintiff at work sitting on his stool holding a cardboard sign that said, "Will work for food." (Employee Warning Notice [#104-2], at 52.) Mr. Perez issued Plaintiff a verbal warning regarding his behavior and notified Plaintiff that any future occurrences would result in additional corrective action, up to termination. (*Id.*)

Plaintiff worked only six days in September 2018. (Timecard [#104-2], at 43–45.) Then, on October 10, 2018, Angelica Olivares, one of Plaintiff's coworkers in the muffin line, submitted a written statement to Ms. Dresner alleging that Plaintiff created a hostile work environment and was harassing her. (Dresner Decl. [#104-2], at 15, ¶ 18; Olivares Statement [#104-2], at 78.) Specifically, Olivares's statement describes how in September and October Plaintiff had repeatedly asked her to go out to eat or get drinks or go dancing with him.

(Olivares Statement [#104-2], at 78.)  According to the statement, Plaintiff told Ms. Olivares that he could make her happier than her husband and that he wanted her to be his girlfriend; when Ms. Olivares denied the advance, Plaintiff became aggressive and upset.  (*Id.*)  The statement also summarizes an incident in which Ms. Olivares claims she suggested they increase the speed of the conveyor belt while working together at the muffin line and Plaintiff began shouting and using profanity.  (*Id.*)  Plaintiff testified in his deposition that Ms. Olivares, not he, was the aggressor during this incident, and that Ms. Olivares made derogatory remarks about his mother and cussed at him on repeated occasions.  (Pl. Dep. [#104-2], at 253:15–23.)

Ms. Dresner thereafter asked other females on the same unit for statements.  (Dresner Decl. [#104-2], at 15, ¶ 19.)  Gracie Mermella submitted a written complaint that stated that on October 10, 2018, while she and Plaintiff were working on the muffin line, Plaintiff told her he wanted to dance with her and asked her out to eat.  (Dresner Decl. [#104-2], at ¶ 19; Mermella Statement [#104-2], at 80.)  The statement provides that Ms. Mermella declined Plaintiff's offer, to which Plaintiff replied he would take her to his house.  (Mermella Statement [#104-2], at 80.)  Additionally, Ms. Mermella complained that, on October 15, 2018, Plaintiff called Ms. Mermella "sexy girl," which made her uncomfortable.  (*Id.*)  According to another statement submitted to Human Resources, Plaintiff asked at least one other female co-worker to go on a date with him during the September-October time frame.  (Duque Statement [#104-2], at 82.)

On October 19, 2018, Plaintiff returned to work after having been absent without leave for several days.  (Timecards [#104-2], at 47.)  Ms. Dresner and Victoria Clary, Sterling's newly-hired Safety Manager, met with Plaintiff to address three issues with him: (1) modified duty; (2) excessive absenteeism; and (3) the sexual harassment allegations against him.  (Dresner Decl. [#104-2], at 15, ¶ 21; Clary Summary [#104-2], at 88; Clary Decl. [#104-2], at 132, ¶¶ 2–3.)

13

First, Ms. Dresner issued a written discussion notice to Plaintiff regarding his accumulation of excessive attendance points in violation of company policy (he was absent in excess of 50 days between May 1, 2018 and October 22, 2018, only some of which were excused pursuant to medical documentation). (Dresner Decl. [#104-2], at 15, ¶ 21; Employee Discussion Notice [#104-2], at 54.) Then, Ms. Clary introduced herself to Plaintiff and explained that she would be the point of contact for his modified work assignments going forward. (Dresner Decl. [#104-2], at 15, ¶ 21.) Finally, Ms. Dresner explained that she had received allegations of sexual harassment against Plaintiff and that she would need to investigate the allegations and speak with the individuals involved before concluding whether anything inappropriate had occurred. (*Id.*)

Ms. Dresner issued an Employee Discussion Notice to Plaintiff documenting that he denied the allegations against him and reminding him that sexual harassment of any kind is prohibited and can result in disciplinary action up to and including termination of his employment. (*Id.*; Employee Discussion Notice [#104-2], at 56.) Plaintiff refused to sign the discussion notice, instead submitting his own written statement denying the allegations. (Dresner Decl. [#104-2], at 15, ¶ 21; Pl. Statement [#104-2], at 58.) Ms. Dresner explicitly told Plaintiff not to discuss the sexual harassment allegations with anybody and not to confront any of the individuals who brought the complaints against him. (Dresner Decl. [#104-2], at 15, ¶ 21.)

At the conclusion of the meeting, Plaintiff and Ms. Clary left Ms. Dresner's office and went to the safety office. (Clary Summary [#104-2], at 88; Clary Decl. [#104-2], at 132, at ¶ 4.) Ms. Clary discussed Plaintiff's modified duty assignments and explained her role in facilitating light duty. (Clary Decl. [#104-2], at 132, at ¶ 4.) At the conclusion of their meeting, Ms. Clary gave Plaintiff the option of assuming his GMP post or watching safety videos in the safety office. (*Id.*) Plaintiff elected the GMP post, so Ms. Clary escorted him there before resuming her

workday.  (*Id.*)  Before leaving, Ms. Clary reminded Plaintiff not to discuss the allegations of sexual harassment with anybody.  (*Id.*)

A manager later notified Ms. Clary that Plaintiff had left the GMP post.  (*Id.*)  Ms. Clary searched the building for Plaintiff and finally found him walking back to the safety office after taking a personal phone call.  (*Id.*)  Ms. Clary determined that she could not trust Plaintiff to remain at the GMP post, so she took him to the safety office and instructed him to watch safety videos.  (*Id.*)  Ms. Clary reiterated to Plaintiff that he was prohibited from discussing the harassment allegations with anybody on the production floor.  (*Id.*)  Once again, Ms. Clary resumed her workday, which necessitated her leaving the safety office to attend a meeting.  (*Id.*)  Ms. Clary returned to the office to find it empty.  (*Id.*)  Ms. Clary found Plaintiff on the muffin line confronting his accusers, exactly as Ms. Dresner and Ms. Clary had instructed him not to do.  (*Id.*)

Ms. Dresner then received reports and statements from the women on Plaintiff's line describing how Plaintiff loudly accused them of lying to Human Resources about him and said he was going to leave the muffin line because he did not need people talking s*** about him or making up lies.  (Employee Statements [#104-2], at 82, 84–86, 91.)  According to these statements, Plaintiff also openly discussed the allegations against him with other employees in the immediate vicinity.  (*Id.*)  Ms. Olivares reported in her statement that she became so upset and uncomfortable by the confrontation that she walked off the job that day.  (*Id.* at 91.)  In his deposition, Plaintiff denied sexually harassing or confronting any of his fellow employees who had made complaints against him to Human Resources.[2]  (Pl. Dep. [#104-2], at 211:11–25.)

---

[2] Throughout the litigation, Plaintiff repeatedly requested a copy of Defendant's video footage from October 19, 2018, which Plaintiff contends would prove that he did not confront the employees, but Defendant represented to the Court that video footage from that date no

Ms. Dresner discussed the employees' reports with Ms. Clary, who confirmed that Plaintiff returned to the muffin line to confront the women who had accused him of inappropriate behavior. (Clary Decl. [#104-2], at 133, ¶ 5.) The following Monday, October 22, 2018, Ms. Dresner spoke with Ms. Olivares regarding her interaction with Plaintiff. (Dresner Decl. [#104-2], at 16, ¶ 24.) As a result of these conversations, Ms. Dresner terminated Plaintiff's employment for the stated reason of failing to follow instructions and engaging in insubordinate and inappropriate behavior by confronting his accusers. (Dresner Decl. [#104-2], at 16, ¶ 25; Termination Notice [#104-2], at 60.)

## VI. Analysis

Plaintiff's claims arise under Title VII and the ADA. Plaintiff asserts claims of discrimination, hostile work environment, and retaliation. Having reviewed Defendant's motion, Plaintiff's filings, and the summary-judgment record in this case, the Court finds that Defendant is entitled to summary judgment as to all of Plaintiff's claims.

### A. Plaintiff failed to exhaust his administrative remedies as to his ADA claims.

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, the advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under the ADA includes both a failure to accommodate a disability and disparate treatment because of a disability. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014).

---

longer exists. During one of the Court's hearings, Defendant explained that, due to its retention policies, any video footage from that date would have been written over. After Defendant made this representation, the Court entered an order requiring Defendant to produce to Plaintiff a declaration confirming its retention policies and the nonexistence of footage from October 19, 2018. (Order [#92] at 2.)

The ADA has an administrative exhaustion requirement, which it incorporates from Title VII. *Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996). An employee must timely file a charge with the EEOC or with a state or local agency with authority to grant or seek relief from the alleged unlawful employment practice before commencing a civil action in federal court under either Title VII or the ADA. *See id.* (citing 42 U.S.C. § 2000e-5(e)(1)). A civil action must be commenced within 90 days of receiving a right-to-sue letter from the EEOC or state or local agency. *Id.* (citing 42 U.S.C. § 2000e-5(f)(1)).

Although Plaintiff filed two charges of discrimination against Defendant—one on September 17, 2018, and one on February 1, 2019—alleging race, color, and sex discrimination, neither of these charges included any allegations of disability-based discrimination or facts to support such a claim. (Pl. Dep. [#104-2], at 243:14–244:1, 9–12; EEOC Charges [#8], at 45–46.) Plaintiff's failure to exhaust administrative remedies as to his ADA claims entitles Defendant to summary judgment on these claims. *Jefferson v. Christus St. Joseph Hosp.*, 374 Fed. App'x 485, 490 (5th Cir. 2010) (affirming district court's ruling that certain claims were unexhausted and therefore failed as a matter of law where plaintiffs failed to check appropriate box on charge of discrimination or describe discriminatory conduct in the charge). Defendant is entitled to summary judgment on this claim.

**B.      Plaintiff cannot establish a prima facie case of race discrimination under Title VII, and Defendant has proffered a legitimate nondiscriminatory reason for Plaintiff's termination, which Plaintiff has failed to rebut.**

Title VII prohibits employment discrimination against "any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235 (5th Cir. 2016). When a plaintiff

offers only circumstantial evidence, the *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination, which, if established, raises a presumption of discrimination. *See Rutherford v. Harris Cnty., Tex.*, 197 F.3d 173, 179–80 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

A prima facie case of discrimination requires a plaintiff to establish four elements: (1) that the individual is a member of a protected class; (2) that the individual was qualified for the position; (3) that the individual suffered an adverse employment action; and (4) that the individual was replaced by or treated less favorably than someone outside the protected class. *Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996). If Plaintiff establishes his *prima facie* case of discrimination, the burden shifts to Defendant to show it had a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802. If Defendant can show a legitimate, non-discriminatory reason for the action, the presumption of discrimination disappears, and the burden shifts back to Plaintiff to show that Defendant's proffered reason was a pretext for discrimination. *See Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019).

      i.      <u>Plaintiff cannot establish a prima facie case of race discrimination.</u>

Defendant argues that Plaintiff cannot establish his prima facie case of discrimination because he cannot show that he was treated less favorably than a similarly situated employee outside his protected class. For an employee to be a similarly situated comparator, the person must have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). In other words, Plaintiff must show that Defendant gave preferential treatment to another employee outside of

Plaintiff's protected class under "nearly identical circumstances." *Id.* The conduct that led to the adverse employment decision must have been also "nearly identical" to that of the alleged comparator. *Id.*

Plaintiff's Second Amended Complaint alleges that he was treated less favorably than other employees "not of his race." (Second Am. Compl. [#81] at ¶ 18.) At his deposition, however, Plaintiff testified that, although he denies that he ever engaged in sexual harassment of any of his fellow employees, he is unable to identify any similarly situated employees who was accused of such conduct by coworkers, and was thereafter accused of publicly confronting those coworkers, and was not terminated. (Pl. Dep. [#104-2], at 279:13–280:14.)

Moreover, Defendant has produced undisputed evidence that it has terminated at least one other individual for engaging in substantially similar acts of misconduct to that for which Plaintiff is accused. (Dresner Decl. [#104-2], at 14, ¶¶ 8–9.) In February 2019, Defendant terminated a Hispanic female for failing to cease communication with a specific coworker, after complaints of inappropriate behavior and a directive to refrain from contact. (*Id.*) Plaintiff's inability to identify a comparator or to proffer any evidence for the Court's consideration regarding Defendant's dissimilar treatment of similarly situated employees is fatal to his claim of race discrimination under Title VII.

ii.   <u>Defendant has produced a legitimate, nondiscriminatory basis for Plaintiff's termination.</u>

Even if Plaintiff could establish his prima facie case of discrimination, Defendant would still be entitled to summary judgment on his Title VII race discrimination claim because Defendant has proffered a legitimate, nondiscriminatory reason for Plaintiff's termination.

Defendant claims that it terminated Plaintiff because it had a reasonable belief that Plaintiff violated specific directives not to interfere with Defendant's investigation into

allegations of sexual harassment against Plaintiff and not to discuss the allegations with anyone, especially his accusers. Defendant claims it had a legitimate business reason for these directives—to preserve the integrity of a sexual harassment investigation and to protect its employees from retaliation for making good-faith complaints of discriminatory or harassing conduct. Additionally, Defendant maintains that Plaintiff's conduct violated Sterling's Harassment policy, which states in part: "Retaliation against an individual for reporting harassment or for participating in an investigation of a claim of harassment is a serious violation and, like harassment itself, will be subject to disciplinary action." (Harassment Policy [#104-2], at 25.)

An employee's violation of an employer's business policy is a legitimate, nondiscriminatory reason for taking an adverse employment action against the employee. *See, e.g.*, *Eaglin v. Tex. Children's Hosp.*, 801 Fed. App'x 250, 256 (5th Cir. 2020) (violation of company policy regarding falsification of time records was legitimate, nondiscriminatory reason for adverse employment action). Moreover, the Fifth Circuit has recognized insubordination as a legitimate reason for termination. *See Manaway v. Med. Ctr. of Se. Tex.*, 430 Fed. App'x 317, 322 (5th Cir. 2011) (identifying insubordination as a nondiscriminatory reason for discharge). The burden on the employer at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation and citation omitted)). Therefore, even assuming Plaintiff's account of the events at issue is correct and he never confronted his accusers on October 19, 2021, Defendant has still satisfied its burden of production as to a nondiscriminatory reason for Plaintiff's termination.

iii.    Plaintiff has failed to raise a fact issue as to pretext.

Finally, Plaintiff has no evidence that Defendant's stated reason for his termination was pretext for race discrimination. Plaintiff's only direct evidence of race discrimination are two remarks by Javier Patlan, Front-End Production Lead, prior to June 6, 2018, the date of Plaintiff's injury. (Pl. Dep. [#104-2], at 95:10–20, 98:17–19.) Plaintiff alleges Mr. Patlan referred to him as a monkey and slave, and that these statements are evidence that Plaintiff's termination constituted discrimination on the basis of race. (*Id.*)

For purposes of Defendant's summary judgment motion, the Court assumes Plaintiff's accusations against Mr. Patlan are true. These statements, although racist, are insufficient on their own to support a claim of discrimination based on race. Statements and remarks may serve as evidence of discrimination only if they are: (1) related to the plaintiff's protected class, (2) close in time to the adverse employment action, (3) made by an individual with authority over the adverse employment action, and (4) related to the employment decision at issue. *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 608 (5th Cir. 2007) (internal citation and quotation marks omitted).

Here, the alleged comments occurred more than four months prior to Plaintiff's termination. There is also no evidence that Mr. Patlan had authority to terminate Plaintiff's employment or that he was in any way involved in that termination. Ms. Dresner attests in her sworn declaration that Plaintiff's supervisor at the time of his termination was Ms. Garza, not Mr. Patlan. (Dresner Decl. [#104-2], at 15, ¶ 12.) Plaintiff only worked under the supervision of Mr. Patlan for the brief period of time, prior to his injury and his reassignment to the muffin line. (*Id.*) Ms. Dresner's declaration further states that Mr. Patlan was not involved in the decision to terminate Plaintiff's employment, nor did she seek his input or rely on his opinions in any way

when she made the termination decision. (*Id.*) Finally, the allegedly offensive comments do not relate to Plaintiff's alleged sexual harassment of his coworkers, his alleged confrontation of those employees, or his termination for the stated reason of insubordination and violation of company policy.

Plaintiff repeatedly testified in his deposition that he believes he was the victim of race discrimination. However, a plaintiff must present evidence, not simply conjecture, of discrimination to establish pretext. *Grimes*, 102 F.3d at 139–40. A party opposing summary judgment must identify specific evidence in the record and articulate how the evidence supports his or her claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "[U]nsubstantiated assertions are not competent summary judgment evidence." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

Plaintiff's deposition testimony may raise a fact issue as to whether he engaged in sexual harassment and whether he did, in fact, confront his accusers. However, even if a jury believed Plaintiff's version of the facts rather than Defendant's, that credibility determination would not support an ultimate finding that Defendant's stated reason for Plaintiff's termination was pretext for *race discrimination*, only that Defendant's investigation reached the wrong conclusion and Defendant made an erroneous personnel decision. *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision"); *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1508 (5th Cir. 1988) (ADEA, applying same evidentiary framework as Title VII, cannot protect employees "from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated."). "[E]ven an employer's incorrect belief in the underlying facts—or an improper decision based on

those facts—can constitute a legitimate, non-discriminatory reason for termination." *Amezquita v. Beneficial Texas, Inc.*, 264 Fed. Appx. 379, 386 (5th Cir. 2008) (unpublished).

Defendant has provided ample evidence to support its position that it had a reasonable belief that Plaintiff had engaged in insubordinate and inappropriate behavior through the multiple statements and complaints accusing Plaintiff of such conduct submitted to Defendant's Human Resources Department. Plaintiff has failed to provide the Court with any evidence, direct or circumstantial, aside from the remarks by Mr. Patlan, to support his belief that his termination was racially motivated. Defendant is therefore entitled to summary judgment on this claim.

**C.      Plaintiff's hostile work environment claim fails as a matter of law.**

To prevail on his claim that he was a victim of a hostile work environment in violation of Title VII, Plaintiff must show (1) that he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) there exists some basis for liability on the part of the employer. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotation omitted).

In determining whether a workplace constitutes a hostile work environment, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferences with an employee's work performance." *Id.* at 23. To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person

would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citation omitted).

The Court agrees with Defendant that Plaintiff's hostile work environment claim fails as a matter of law because Plaintiff has failed to produce sufficient evidence from which a reasonable juror could conclude that the alleged harassment was because of his race. Moreover, Plaintiff has failed to provide the Court with any evidence that the alleged harassment was sufficiently offensive, severe, or pervasive so as to alter a term of his employment in violation of Title VII.

Plaintiff's Second Amended Complaint includes allegations about Mr. Patlan's two remarks, his work-related injury, and his termination. (Second Am. Compl. [#81].) The only evidence before the Court about these allegations that could support Plaintiff's claim of a hostile work environment based on his race are the excerpts from Plaintiff's deposition submitted by Defendant regarding Mr. Patlan's offensive comments referring to Plaintiff as a monkey and slave, detailed previously herein. (*See* Pl. Dep. [#104-2], at 95:10–20, 98:17–19.) However, this testimony is insufficient evidence of a hostile work environment.

The "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (internal quotation and citation omitted). Isolated incidents only support a hostile work environment claim when the complained-of incident is "extremely serious" in nature. *Faragher*, 524 U.S. at 788. The Fifth Circuit has found that isolated comments to a Black female employee about "ghetto children" and additional derogatory comments about the employee's education, car, and shopping habits were not sufficient to demonstrate a hostile work environment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007). *See*

*also Howard v. United Parcel Serv., Inc.*, 447 Fed. App'x 626, 632 (5th Cir. 2011) (affirming summary judgment ruling in favor of employer where there was evidence of a "racially inappropriate" comment but failed to offer evidence of an "ongoing pattern of racially inappropriate incidents"). *Cf. Walker v. Thompson*, 214 F.3d 615, 626–28 (5th Cir. 2000) (holding hostile work environment claim survived summary judgment where evidence demonstrated years of inflammatory racial epithets directed at plaintiff), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

Plaintiff testified in his deposition that he was the intended target of two offensive comments during his first few weeks of employment with Defendant by his initial supervisor, Mr. Patlan, but that no one in management ever made any other discriminatory comments towards him after June 6, 2018. (Pl. Dep. [#104-2], at 100:5–14; 104:16–20; 109:24–110:5.) Nor did he continue to work under Mr. Patlan after his injury. Mr. Patlan's isolated comments were not severe or pervasive enough to have altered the conditions of employment so as to create an abusive work environment that implicates Title VII.

Finally, Plaintiff's deposition testimony regarding harassment by his supervisor Ms. Garza and Ms. Clary, Sterling's Safety Manager, is also insufficient to raise a fact issue on Plaintiff's hostile work environment claim. Plaintiff testified that Ms. Garza cussed at Plaintiff five or six times over the course of her four months as his supervisor, was "evil" and "disrespectful" towards Plaintiff, reported Plaintiff for taking excessive breaks at work, reprimanded Plaintiff for throwing contaminated foods in the wrong receptacle and over disagreements regarding the USDA protocol regarding cupcake liners, and directed him repeatedly to return to his assigned area. (Pl. Dep. [#104-2], at 97:16–22; 138:19–23, 148:22–149:3, 247:22–248:4; 268:2–12, 284:22–24; 286:2–13.) Yet, Plaintiff testified Ms. Garza never

used any racial epithets towards him during his employment and that he witnessed Ms. Garza having disputes with other employees. (*Id.* at 285:3–11.) Plaintiff conceded in his deposition that he never complained to Human Resources about Ms. Garza before he was terminated and that her behavior did not ever affect a term, condition, or privilege of his employment. (*Id.* at 163:4–11, 248:16–18, 291:10–20.) Plaintiff's testimony regarding Ms. Garza is insufficient to create a fact issue on his claim of a hostile work environment.

There is also no evidence that Ms. Clary's alleged mistreatment of Plaintiff was motivated by racial animus. Plaintiff testified that Ms. Clary created a hostile work environment because she lied about his conduct, which led to his wrongful termination. (*Id.* at 288:24–289:20.) Plaintiff also testified that he believes he was targeted by Ms. Clary because he was the only African American in his department among predominately Hispanic colleagues. Plaintiff testified that based on "years of experience," "it's known to happen everywhere all the time" that Hispanic individuals harbor racial discrimination towards African Americans. (*Id.* at 247:7–248:8, 268:13–23, 291:1–4.) Yet, Plaintiff conceded in his deposition that he had no facts and no evidence to support his belief that Ms. Clary had lied about him because of his race. (*Id.* at 289:13–23.) Plaintiff's subjective belief that he was the victim of race-based harassment is not objectively reasonable in light of the totality of the circumstances and Plaintiff's other statements in his deposition. *See Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).

**D.    Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim.**

Plaintiff is also unable to establish a prima facie case of retaliation under Title VII. Title VII retaliation claims are governed by the same burden-shifting framework as Plaintiff's claim of race discrimination. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). To establish a prima facie case of Title VII retaliation, a plaintiff must show the following: (1) he

participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id.* at 557. Defendant argues Plaintiff's retaliation claim fails because he cannot establish this essential causal connection. The Court agrees.

Plaintiff claims he made an internal complaint regarding Mr. Patlan's alleged race-based comments prior to his work-related injury on June 6, 2018. (Pl. Dep. [#104-2], at 100:5–14.) An employee who files an internal complaint of discrimination engages in protected activity. *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001), *abrogation on other grounds recognized in Smith v. Xerox Corp.*, 602 F.3d 320, 327 (5th Cir. 2010). However, there is no evidence of any relationship—temporal or otherwise—between the filing of this complaint and the alleged retaliation by Ms. Garza and Plaintiff's ultimate termination.

A plaintiff alleging Title VII retaliation must provide specific evidence "which could support a finding that she would not have [been terminated] in the absence of having engaged in protected conduct." *Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999). Plaintiff testified in his deposition that he did not tell Ms. Garza about Mr. Patlan's racist comments and was unsure whether he told her that he had made an internal complaint. (Pl. Dep. [#104-2], at 138:4–14.) The undisputed summary judgment evidence proffered by Plaintiff establishes that neither Mr. Patlan nor Ms. Garza was involved in the decision to terminate Plaintiff's employment. (Dresner Decl. [#104-2], at 15, ¶ 12.) Given the length of time between the report of the comments and the termination, the intervening accusations of harassing behavior against Plaintiff by his coworkers, the reports to Defendant of Plaintiff's interference in the investigation of these accusations, the timing of Plaintiff's termination immediately after these accusations and reports, and the implementation of Plaintiff's termination by Human

Resources Director Ms. Dresner and not Ms. Garza or Mr. Patlan, no causal nexus can be inferred between Plaintiff's report of Mr. Patlan's racist comments and Plaintiff's termination.

In summary, Plaintiff has failed to provide any evidence of a causal connection between his protected activity and his termination that could support a claim of Title VII retaliation. Moreover, as detailed *supra*, Defendant has produced a legitimate, nondiscriminatory and nonretaliatory reason for Plaintiff's termination, which Plaintiff has failed to rebut.

## VII.  Conclusion

Having considered Defendant's summary judgment motion, the other motions and filings before the Court, as well as the entire summary judgment record in this case, the Court will grant Defendant's motion and dispose of the other miscellaneous motions as set forth herein.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment [#104] is **GRANTED**.  The Court will issue a separate final judgment in favor of Defendant as to all of Plaintiff's claims.

**IT IS FURTHER ORDERED** that Plaintiff's "Motion for Continuous Rule § 252:  Due Process the Fifth and Fourteenth Amendment of the United States Constitution of the United States of America" [#116] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's "Summary Judgement [sic] Rule(3)" [#118] is **TERMINATED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for "Extension because of Death in the Family" is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike [#128] is **GRANTED**.

**IT IS FINALLY ORDERED** that Plaintiff's Motion for "Judicial Notice, Sterling Food's Illegal Tactics and Suppression of Evidence" [#127] and Plaintiff's Motion for Reconsideration [#129] are **STRICKEN** from the record.

SIGNED this 7th day of July, 2021.

_____
ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE